812 F.2d 1408
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Raymond SEARLS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 85-4043.
 United States Court of Appeals, Sixth Circuit.
 Jan. 19, 1987.
 
 Before WELLFORD and GUY, Circuit Judges; and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, a barber, who allegedly suffered a heart attack on December 11, 1982, appeals from a determination that he is not disabled within the meaning of the Social Security Act. His claim for benefits was denied at all administrative levels by the Secretary. The district court affirmed the final administrative decision. Plaintiff claims that the decision of the administrative law judge is not supported by substantial evidence and seeks reversal of the district court's denial of benefits.
 
 
 2
 Plaintiff was fifty-seven years old when he filed his claim for benefits. After completion of the eighth grade, he served in the U.S. Air Force from 1943-45. He obtained a GED in 1949, graduated from barber school in 1950, and then worked as a self-employed barber until December 11, 1982. As a barber, he stood most of the time, but he had the option of sitting on a barber's stool. He does not use the stool because, as he stated at the hearing, "I tried it and I didn't like it." Searls concedes that he does not have to move supplies and does not have to lift over ten pounds, though he must occasionally bend and must frequently reach in the course of his trade.
 
 
 3
 Plaintiff contends that he became disabled following an attack on December 11, 1982, when he experienced an acute shortness of breath while working. Prior to the arrival of the emergency squad, Searls was in respiratory arrest and his heart rate dropped to 40 beats per minute. Upon receiving medical aid, his heart rate immediately advanced to 150 beats per minute. On admission, Searls' pupils were equal and reactive to light. A regular cardiac rhythm was present, but further evaluation of heart tones was hampered by pulmonary sounds. Auscultation of the lungs revealed inspiratory and expiratory ronchi and rales. Doctor Wanko, Searls' treating physician, noted three differential diagnoses: (1) "Acute myocardial infarction," (2) "Pulmonary edema secondary to # 3," and (3) "Pulmonary thromboembolism." At the time the doctor's prognosis was extremely guarded and Searls' condition was deemed by him to be critical. Subsequent tests showed the presence of pneumonia and a normal heart size. A study showed some arrythmia and the left ventricle appeared to contract less than optimally. Searls was discharged after a few weeks and he has not required further hospitalizations.
 
 
 4
 Dr. Wanko, an osteopath, concluded that Searls had experienced a respiratory arrest secondary to an acute pulmonary edema, the etiology of which was uncertain. He stated that Searls did not have congestive heart failure. A stress test performed on February 23, 1983, showed that Searls tired easily but he did not have any chest pain during the test and no arrhythmia was documented. Dr. Wanko was of the opinion "that further employment ... is impossible and I would highly recommend that he be placed on total disability."
 
 
 5
 David J. Magorien, an internist and cardiologist, subsequently examined Searls. Searls complained to him of chest pain not related to exercise. He also complained of shortness of breath after climbing one-and-a-half flights of stairs or walking one-half block; he admitted to "a 120 pack year history of cigarette smoking."[1] Searls told Dr. Magorien that in December, 1982, his doctor diagnosed diabetes and prescribed insulin twice a day. Since then he has been checking his urine on a daily basis but it is negative. Searls indicated that since his "attack" he had been treated for hypertension but, like the diabetes, it was under good control with medication.
 
 
 6
 Searls testified that his weight before the December, 1982, episode was 220 pounds. He said he weighed 188 pounds at the hearing on August 23, 1983. He weighed 201 pounds on October 5, 1983. A 1983 physical examination revealed a mild prolongation of the expiratory phase of the respiratory cycle of the lungs without rales, rhonci, or wheezing. A neurologic exam was not abnormal. After evaluating the results of an EKG and an x-ray, Dr. Magorien diagnosed "History of a Myocardial Infarct with Continued Episodes of Chest Pain", "Diabetes Mellitus", "Mild Obstructive Airway Disease," and "Hypertension." Dr. Magorien concluded his report with the following comment:
 
 
 7
 This patient is a 58 year old white male who presents with problems as listed above. He states that he sustained a heart attack but his resting EKG at this time does not reveal evidence for a transmural myocardial infarct. He may well have sustained a subendocardial infarction. It would be helpful to contact his physician to determine how the diagnosis of a myocardial infarct was established. He continues to experience chest pain which is somewhat atypical for that caused by coronary artery disease due to the fact it occurs at rest. It radiates to the back. He is unclear as to whether Nitroglycerin actually helps the chest pain. Certainly he is at increased risk for coronary artery disease because of his risk factors, including a 120 pack year history of cigarette smoking, a markedly positive family history for coronary artery disease, diabetes mellitus and hypertension. He states that his diabetes has been well-controlled on Insulin therapy. He is presently being treated with a bronchodilator for his shortness of breath. The dizziness he complains of seems to be related to his changing position. At the present time, his hypertension appears to be well controlled on Lopressor. Funduscopic exam does reveal evidence for chronic hypertension. He denies symptoms of congestive heart failure and there were no findings suggestive of this on physical exam.
 
 
 8
 Searls' attorney contacted the treating physician, Dr. Wanko, about Dr. Magorien's report. Dr. Wanko responded by summarizing the events leading to Searls' hospitalization on December 11, 1982, stating that at the time of his initial evaluation "he was in frank pulmonary edema," but he admitted: "[t]ere were no EKG changes of an acute heart attack but one was suspected. We could not rule out a primary arrhythmia as being the etiology of his cardiac arrest,...."
 
 
 9
 Two other physicians reached conclusions consistent with Dr. Magorien's opinion that Searls had not suffered a myocardial infarction. William R. Griffin, a specialist in internal medicine and pulmonary diseases, and consultant to the Ohio Disability Determination Service (DDS) reviewed the medical evidence on March 21, 1983, and concluded that a transmural myocardial infarction had not been documented. In Dr. Griffin's opinion, Searls would be able to do medium work. On May 9, 1983, Dr. Drew J. Arnold, a general surgeon and consultant to DDS, also examined the medical evidence available. He noted that the EKG of December, 1982, did not show a transmural myocardial infarction. He added that Searls' chest pain was not typical of cardiac-related pain, and that the diabetes and hypertension were well controlled with medication. He also concluded that Searls retained the residual functional capacity for medium work. The conclusions reached by Drs. Griffin and Arnold are consistent with Dr. Wanko's statement of August 17, 1983, to the effect that "there were no EKG changes of an acute heart attack".
 
 
 10
 Searls complained at the administrative hearing of chest pain, which he claimed to be present most of the time. Searls alleged that he experiences chest pains with excitement, nerves, exertion, and even while at rest, but admitted that the pain did not radiate to any other part of the body. He also complained of occasional dizziness and light headedness as a result of being a diabetic. Searls testified that he sees Dr. Wanko every six weeks for check-ups.
 
 
 11
 We note that Dr. Wanko has not imposed any restrictions or limitations on Searls' activities. Searls cooks, goes grocery shopping, does his laundry occasionally, and does light housework such as dusting and washing dishes. He regularly visits a nearby doughnut shop where he sits, drinks coffee, and talks to other patrons; sometimes he meets a friend at a restaurant and they converse over a cup of coffee. He is able to take public transportation, and he can drive. Searls can and does regularly climb the stairway leading to his second floor apartment.
 
 
 12
 Searls testified that he can only walk approximately two blocks, stand five or ten minutes, and lift no more than ten pounds. When asked what problems, if any, he experienced with sitting for prolonged periods of time, Searls responded: "I--if I sit for very long, I go to sleep ... you sit down and the first thing you know, you're asleep. And then you're uncomfortable." He said that he once tried to cut hair again, but had to stop after about ten minutes.
 
 
 13
 The ALJ found that Searls' diabetes and hypertension both were well controlled by medication. He further found that Searls had experienced a respiratory arrest secondary to an acute pulmonary edema in December, 1982, but that the evidence did not show that the episode was caused by a heart condition which had lasted, or could be expected to last, for twelve months. Thus, he concluded, the episode of December 11, 1982, cannot be considered an impairment for purposes of a disability evaluation under the Act. Because the other documented impairments, whether singly or in combination, are not severe, the ALJ found Searls not disabled.
 
 
 14
 Veterans Administration Outpatient Clinic records show that Searls' blood pressure levels were mildly elevated or normal on repeated examinations. During an August 19, 1983, visit to the V.A., Searls denied experiencing any chest pain or having any significant problems. An x-ray showed that Searls' heart size is within normal limits and that he has moderate degenerative changes in the thoracic spine.
 
 
 15
 Garner v. Heckler, 745 F.2d 383 (6th Cir.1984), enunciated a seven-step approach to evaluating social security cases:
 
 
 16
 1. Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. Sec. 404.1520(b); 20 C.F.R. Sec. 416.920(b).
 
 
 17
 2. Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. Sec. 404.1508; 20 C.F.R. Sec. 416.908.
 
 
 18
 3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to Step 4. If no, the claimant is not disabled. See 20 C.F.R. Secs. 404.1520(c), 404.1521; 20 C.F.R. Secs. 416.920(c), 416.921.
 
 
 19
 4. Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. Sec. 404.1509; 20 C.F.R. Sec. 416.909.
 
 
 20
 5. Does the claimant have any impairment or combination of impairments meeting or equalling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. Secs. 404.1520(d), 404.1526(a); 20 C.F.R. Secs. 416.920(d), 416.926(a).
 
 
 21
 6. Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant is not disabled. If no, proceed to Step 7. See 20 C.F.R. Sec. 404.1520(e); 20 C.F.R. Sec. 416.920(e).
 
 
 22
 7. Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. If no, the claimant is disabled. See 20 C.F.R. Secs. 404.1505(a), 404.1520(f)(1); 20 C.F.R. Secs. 416.905(a), 416.920(f)(1).
 
 
 23
 Id. at 387.
 
 
 24
 Using this analysis, it is clear, first, that Searls is not currently engaged in gainful activity. Proceeding to Step 2, Searls has medically determinable physical impairments: obesity, respiratory problems, hypertension, and diabetes mellitus. Thus, we proceed to Step 3.
 
 
 25
 Searls claims that his heart condition prevents him from doing basic activities like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. We find substantial evidence supporting a contrary view. Two doctors' reports indicate Searls can lift, carry, bend, stoop, sit, push, pull, and reach without significant limitation. His treating physician has not limited Searls' activities in any manner. We find support, therefore, for the conclusion that plaintiff has demonstrated no severe impairment, whether considered singly or in combination.
 
 
 26
 We find substantial evidence, moreover, in support of the conclusion that the impairments do not meet or equal the listed impairments. Searls is, therefore, not disabled within the meaning of the Act.
 
 
 27
 Searls argues that insufficient credit was given to his treating doctor's opinion in this case. Searls emphasizes that Dr. Magorien examined him on only one occasion. Searls believes his treating physician's report should be given much more weight than all the other physicians' reports.[2] The opinions of three examining physicians are more than adequate to undergird the Secretary's findings in this case. Even Dr. Wanko concluded that there is no positive indication of an acute heart attack.
 
 
 28
 Searls also argues that his impairments meet the listings under 20 C.F.R. Part 404, Subpart P, Appendix 2. He believes that his claimed severe heart disease complicated by hypertension and diabetes establishes that he is disabled under this regulation. Doctors Griffin and Arnold, however, are of the view that Searls can perform medium work activity and can sit for "about 6 hours." Based on the above medical evidence, Searls' impairments do not meet or equal a listed impairment.[3]
 
 
 29
 Since there is substantial evidence that plaintiff is not disabled within the meaning of the law and the regulations, we AFFIRM the district court's decision denying benefits.
 
 
 
 [1]
 Five months later Searls still was smoking half a pack of cigarettes per day and denied ever being advised by a doctor to stop smoking
 
 
 [2]
 We agree that, as a general rule, treating physicians' opinions are entitled to greater weight than are non-treating physicians' opinions. E.g., 20 C.F.R. Secs. 404.1529, 416.929; Garner v. Heckler, 745 F.2d 383, 391 (6th Cir.1984); Hurst v. Schweicker, 725 F.2d 53, 55 (6th Cir.1984). However, "[t]he Secretary is not bound by a broad conclusory statement of a treating physician in making this determination." Garner, 745 F.2d at 391. Further, no authority states that a treating physician's opinion is entitled to the complete deference that Searls argues it should be given in this case
 
 
 [3]
 Whether Searls can perform his past relevant work is debatable. Both Searls and Dr. Wanko assert that he cannot. Doctors Griffin, Magorien, and Arnold each concluded that Searls could perform medium work and could do everything necessary to be a barber as Searls described barbering. We need not reach this decision in light of our previous discussion of the issues